UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

THE ESTATE OF YARON UNGAR
by and through its Administrator,
David Strachman,

DVIR UNGAR, minor,
by his guardians and next friends,
YISHAI UNGAR, minor,
by his guardians and next friends,

PROFESSOR MEIR UNGAR,
JUDITH UNGAR, individually and in
their capacity as legal guardians of Petitioners
Dvir and Yishai Ungar,

RABBI URI DASBERG,
JUDITH DASBERG, in their capacity as legal
guardians of Petitioners Dvir and Yishai Ungar,

AMICHAI UNGAR,
DAFNA UNGAR

and

MICHAL COHEN

                    Petitioners,


        v.

MORGAN STANLEY/
MORGAN STANLEY DW, INC.
1221 Avenue of the Americas 4th Fl.
New York, New York 10020,

REPUBLIC BANK OF NEW YORK (HSBC)/
HSBC BANK USA
452 Fifth Ave
New York, New York 10022,

*ECF CASE*

**Civil Action No.** 05-CIV
3710

**PETITION PURSUANT
TO CPLR 5225 AND 5227**

CHASE BANK OF TEXAS—J.P. MORGAN CHASE & CO./
J.P. MORGAN CHASE BANK
270 Park Avenue
New York New York 10022,

CITIBANK/
CITIGROUP, INC.
425 Park Avenue
New York, New York 10043

and

THE HOLY LAND FOUNDATION
FOR RELIEF AND DEVELOPMENT
345 E. Railway Avenue
Patterson, New Jersey

                    Respondents

--------------------------------------------------------------------x

Petitioners, by counsel, respectfully allege in support of their Petition as follows:

## NATURE OF PROCEEDING AND RELIEF REQUESTED

1.      Petitioners hold a judgment in excess of $116,000,000 against the HAMAS terrorist organization that was entered by the United States District Court for the District of Rhode Island on February 11, 2004, and registered in this Court as Judgment No. 04-1032 on June 1, 2004 ('judgment").

2.      Pursuant to §201 of The Terrorism Risk Insurance Act of 2002, petitioners' judgment is enforceable against assets of respondent The Holy Land Foundation for Relief and Development ("HLF"), a Texas-based organization that operates as the fundraising arm of HAMAS in the United States.

3.      In early September 2004, the United States Marshal levied a writ of execution issued by this Court on respondents MORGAN STANLEY, REPUBLIC BANK OF NEW

2

YORK (HSBC), CHASE BANK OF TEXAS – J.P. MORGAN CHASE & CO. and CITIBANK ("respondent banks") all of which hold funds belonging to HLF.

4.      In response to the levy of petitioners' writ, on September 24, 2004, the Department of Justice filed an *ex parte* application in the federal district court for the Northern District of Texas (Dallas) for a restraining order pursuant to 21 U.S.C. §853(e)(1)(A) prohibiting any disposition in HLF's accounts, on the explicit and primary ground that such an order was necessary in order to halt petitioners' enforcement proceedings.

5.      The Dallas federal court issued the requested restraining order *ex parte* the same day ("restraining order").

6.      The *ex parte* restraining order purports to remain in force indefinitely, and the respondent banks have therefore refused to comply with the writs of execution.

7.      As discussed in full detail *infra*, the restraining order is void and/or ineffective to prevent petitioners' execution proceedings against the HLF funds held by the respondent banks, and the respondent banks are thus obligated to comply with the writ of execution issued by this Court and to remit the HLF funds to the petitioners.

8.      Petitioners therefore bring this action pursuant to CPLR 5225 and 5227 for a judgment ordering the respondent banks to transfer all HLF funds held by them to the United States Marshal for turnover to the petitioners.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this matter pursuant to 28 U.SC. §§ 1331, 1367 and 2201, §201 of the Terrorism Risk Insurance Act of 2002, Fed.R.Civ.P. 69, CPLR 5225 and 5227, and the Court's ancillary enforcement jurisdiction.

10.    This Court has jurisdiction over respondents pursuant to Fed.R.Civ.P. 4(k) and CPLR 301 and 302.

11.    The Southern District of New York is the proper venue for this action pursuant to 28 U.S.C. §1391(b) since a substantial part of the property that is the subject of this action is situated in this district, and is *in custodia legis* in this Court.

## THE PARTIES

12.    Petitioner THE ESTATE OF YARON UNGAR, which is represented in this action by a court-appointed administrator, attorney David Strachman, holds a judgment against HAMAS in the amount of $2,932,158.00.

13.    Petitioners DVIR UNGAR and YISHAI UNGAR, minors who bring this action through their grandparents and legal guardians petitioners Meir Ungar, Judith Ungar, Uri Dasberg and Judith Dasberg, each hold a judgment against HAMAS in the amount of $30,488,482.50.

14.    Petitioners PROFESSOR MEIR UNGAR and JUDITH UNGAR, who bring this action individually and in their capacity as legal guardians of petitioners Dvir and Yishai Ungar, each hold a judgment against HAMAS in the amount of $15,000,000.00.

15.    Petitioners RABBI URI DASBERG and JUDITH DASBERG bring this action in their capacity as legal guardians of petitioners Dvir and Yishai Ungar.

16.    Petitioners AMICHAI UNGAR, DAFNA UNGAR and MICHAL COHEN each hold a judgment against HAMAS in the amount of $7,500,000.00.

4

17.    Upon information and belief, respondent MORGAN STANLEY is a corporation which transacts business in New York and has offices at 1221 Avenue of the Americas 4th Fl, New York, New York.

18.    Upon information and belief, respondent REPUBLIC BANK OF NEW YORK (HSBC) is a corporation which transacts business in New York and has offices at 452 Fifth Ave, New York, New York.

19.    Upon information and belief, respondent CHASE BANK OF TEXAS—J.P. MORGAN CHASE & CO. is a corporation which transacts business in New York and has offices at 270 Park Avenue, New York, New York.

20.    Upon information and belief, respondent CITIBANK is a corporation which transacts business in New York and has offices at 425 Park Avenue, New York, New York.

21.    Upon information and belief, respondent HOLY LAND FOUNDATION FOR RELIEF AND DEVELOPMENT is a corporation organized under the laws of California which holds assets and transacts business in New York.

## STATEMENT OF FACTS

### a.    Petitioners' Judgment

22.    Petitioners are the orphaned children, parents, siblings and administrator of the estate of U.S. citizen Yaron Ungar, who was murdered along with his pregnant wife Efrat in a terrorist machine-gun attack carried out by the HAMAS terrorist organization (also known as "The Islamic Resistance Movement") on June 9, 1996 in Israel.

23.    A 25 year-old New York native, Yaron was a schoolteacher studying for rabbinical ordination when he was murdered. The Ungars were ambushed while returning from

a wedding. Efrat shielded their ten month-old son Yishai from the bullets and he survived the attack. The Ungars' other son Dvir, then two years old, was not in the vehicle.

24.    In March 2000, the Ungars filed suit against HAMAS and other defendants in the United States District Court for the District of Rhode Island under the Antiterrorism Act ("ATA") 18 U.S.C. §2331 et seq.

25.    Section 2333(a) of the ATA creates a cause of action for a U.S. national, or his estate, survivors and heirs, injured by reason of an act of *"international terrorism"* as defined in §2331.

26.    The Ungars' suit was (to the best of their knowledge) the first civil action brought under the ATA.[1]

27.    HAMAS defaulted the action, but the Rhode Island federal court did not proceed immediately to default judgment. Instead, the court required the Ungars to submit evidence that HAMAS has contacts with the United States sufficient under the 5th Amendment to permit the exercise of in personam jurisdiction, and instructed the Ungars to extensively brief the yet-unexamined question of the scope of damages allowed under the ATA.

28.    The court also conducted a damages hearing over several days in July 2002, at which the Ungars and several expert witnesses testified about the details of the murder, Yaron's conscious suffering before death (Efrat was killed instantly), and the economic, emotional and psychological impact that the murder has had on Dvir and Yishai, and the other immediate members of the Ungar family. See Ungar v. The Palestinian Authority, 304 F. Supp.2d 232, 243-279 (D.R.I. 2004).

---

[1] Other plaintiffs have followed the Ungars' lead. See e.g. Boim v. Quranic Literacy Institute, 291 F.3d 1000 (7th Cir. 2002); Rubin v. Hamas, 2004 WL 2216489 (D.D.C. September 27, 2004).

29.    On July 3, 2003, Magistrate Judge David L. Martin issued a treatise-like Report and Recommendation ("Report"), stretching to nearly forty pages, detailing the basis for the court's exercise of personal jurisdiction over HAMAS, analyzing the scope of damages permitted under the ATA and recommending entry of default judgment against HAMAS in the amount of $116,409,123 in damages, plus pre-judgment interest.    See Report and Recommendation attached to Ungar, 304 F. Supp.2d at 243-279.

30.    The Report specifically noted the great effort invested by the Ungars and their counsel in briefing the numerous issues of first impression raised by the suit. Id. at 278 ("[T]his litigation presented special challenges. There was little precedent to follow. Plaintiffs' counsel had to travel to Israel to gather evidence to support the claims being made.")

31.    The district judge did not immediately adopt the Report, but instead instructed the Ungars to brief the question of whether pre-judgment interest was available under the ATA. Id. at 236.

32.    On January 27, 2004, Senior U.S. District Judge Ronald R. Lagueux issued a Memorandum and Order adopting the magistrate's Report (except regarding pre-judgment interest) and entering final judgment for the plaintiffs against HAMAS for $116,409,123.00 in damages, plus attorney's fees and costs. Id. at 242-243.

33.    Thus, the Ungars received a judgment against HAMAS nearly **four years** after filing suit, and only after investing very considerable financial and emotional resources and reliving through testimony the excruciating details of the terrorist murder and its aftermath.

**b.    HAMAS and HAMAS' Agencies and Instrumentalities**

34.    At all times relevant hereto HAMAS is and was a composite and/or umbrella organization constituted of both natural persons and various legal persons, including a number of corporations and unincorporated associations which serve as agencies, instrumentalities and organs of HAMAS ("HAMAS agencies and instrumentalities").

35.    At all times relevant hereto HAMAS' agencies and instrumentalities are and were utilized by HAMAS' leadership to raise and distribute funds.

36.    At all times relevant hereto, a number of HAMAS agencies and instrumentalities raised funds in North America, Europe and elsewhere and transferred those funds to other HAMAS agencies and instrumentalities located in the West Bank and Gaza Strip which then distributed those funds to HAMAS' terrorist operatives and cells.

37.    At all times relevant hereto respondent Holy Land Foundation ("HLF") is and was one of HAMAS' agencies and instrumentalities, assigned by the HAMAS leadership with the task of raising funds for HAMAS in the United States.

38.    HLF was established by HAMAS for the purpose of raising funds for HAMAS in the United States.

39.    Since its establishment and at all times relevant hereto, the HLF raised funds for HAMAS in the United States and transferred those funds to its sister HAMAS agencies and instrumentalities in the West Bank and Gaza.

40.    At all times relevant hereto, the HLF was controlled by HAMAS and its leadership, and/or operated under the control and/or direction and/or pursuant to the instructions of HAMAS and the HAMAS leadership, and was an organ and/or agent of HAMAS.

    **c.**    **The Blocking of Assets Belonging to HAMAS and HAMAS' Agencies and Instrumentalities in the United States**

41.     The International Emergency Economic Powers Act, 50 U.S.C. §1701 *et seq.* ("IEEPA") authorizes the President, under certain conditions, to block any property subject to the jurisdiction of the United States. 50 U.S.C. §1702.

42.     On January 23, 1995, the President issued Executive Order 12947 (60 Fed. Reg. 5079) pursuant to IEEPA.  Executive Order 12947 designated HAMAS as a "Specially Designated Terrorist" or SDT, and blocked its assets.  Executive Order 12947 also provides for other persons or organizations to be designated as SDTs and thereby have their assets blocked, if found to be "*owned or controlled by, or to act for or on behalf of*" HAMAS. Id.

43.     On September 23, 2001, the President issued Executive Order 13224 pursuant to IEEPA. (66 Fed. Reg. 49079).  Executive Order 13224 designated HAMAS as a "Specially Designated Global Terrorist," or SDGT, and blocked its assets under this designation as well. Executive Order 13224 also provides for other persons or organizations to be designated as SDGTs and thereby have their assets blocked, if found to "*act for or on behalf of*" HAMAS or to be "*owned or controlled by*" HAMAS.

44.     On December 4, 2001, the Secretary of the Treasury determined that the HLF "*acts for or on behalf of*" HAMAS, and designated the HLF as an SDT under Executive Order 12947 and as an SDGT under Executive Order 13224.  Holy Land Foundation v. Ashcroft, 219 F. Supp.2d 57, 64 (D.D.C. 2002).  Specifically, the Treasury based its determination on the fact that HLF functions as the fund-raising arm of HAMAS in the United States.  Id. at 69-74. Pursuant to these designations, the Office of Foreign Assets Control ("OFAC") in the Treasury issued a "Blocking Notice" freezing all of HLF's funds, accounts and other property.  Id. at 64. Exhibit A.

9

45.    The District Court and Court of Appeals for the District of Columbia upheld the designation of the HLF as an SDT and SDGT on the basis of its role as the fund-raising arm of HAMAS in this country. Holy Land Foundation v. Ashcroft, 219 F. Supp.2d 57 (D.D.C. 2002), 333 F.3d 156 (D.C. Cir. 2003) cert. denied 124 S. Ct. 1506 (2004). Indeed, that Court of Appeals held that "*HLF's role in the funding of Hamas and of its terrorist activities is incontrovertible.*" Id. at 165.

    **d.**    **The Effect of Blocking Under IEEPA**

46.    Executive Orders 12947 and 13224 both prohibit "any transaction or dealing by United States persons or within the United States in property or interests in property" of SDTs and SDGTs without legal authorization from OFAC. Executive Order 12947 §1(b); Executive Order 13224 §2(a) (emphasis added).

47.    Likewise, the OFAC regulations implementing the blocking orders provide that all property of SDTs and SDGTs are blocked and may not be "transferred, paid, exported, withdrawn or otherwise dealt in." 31 CFR §§594.201 and 595.201.

48.    OFAC regulations define a "transfer" as including every imaginable disposition or modification of rights or interests in the property, and any type of encumbrance. 31 CFR §§594.312 and 595.313.

49.    Moreover, the regulations also provide that any putative unlicensed "transfer" made in respect to blocked property "is null and void and shall not be the basis for the assertion or recognition of any interest in or right, remedy, power or privilege with respect to such property." 31 CFR §§594.202 and 595.202.

    **e.**    **The Terrorism Risk Insurance Act of 2002 Subjects the Blocked Assets of the HLF to Execution in Satisfaction of Plaintiffs' Judgment Against HAMAS**

50.    On November 26, 2002, the President signed into law The Terrorism Risk Insurance Act of 2002 (Public Law 107-297; 116 Stat. 2322) ("TRIA").

51.    Section 201 of Title II of the TRIA provides in relevant part that:

> Notwithstanding any other provision of law . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to, execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA §201(a).

52.    The remedial legislative purpose of the TRIA was described in a recent decision of the U.S. District Court for the District of Columbia:

> The TRIA was . . . specifically intended "to deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism in any court of competent jurisdiction by enabling them to satisfy such judgments through the attachment of blocked assets of terrorist parties."  148 Cong. Rec. H8728 (Nov. 13, 2002).

Hill v. Republic of Iraq, 2003 WL 21057173 (D.D.C. 2003), at 2.

53.    A "*terrorist party*" as defined by TRIA includes both terrorist organizations and designated foreign state sponsors of terrorism.  TRIA §201(d)(4).

54.    True to its remedial purpose, TRIA is revolutionary in two respects:

(i)    Section 201 permits attachment and execution proceedings against terrorist parties "*Notwithstanding any other provision of law,*" and thereby expressly overrides any and all legal obstacles to enforcement. See e.g. Hill, 2003 WL 21057173 at 2 (holding that TRIA's "notwithstanding" language overrides the IEEPA blocking regime, the Foreign

Sovereign Immunities Act, and the Vienna Convention on Diplomatic Relations).

(ii)    Section 201 also functions as an automatic statutory veil-piercing mechanism that allows American victims of terrorism holding a judgment against a "terrorist party" to also enforce that judgment against the assets of "*any agency or instrumentality of that terrorist party.*" §201.

55.    The machine-gun murder of the Ungars by HAMAS was an "act of terrorism" as defined by TRIA[2] and HAMAS clearly meets the definition of a "terrorist party" under TRIA.[3] Therefore, §201(a) renders all "blocked assets" of HAMAS, as well as all "blocked assets" of any agency or instrumentality of HAMAS subject to execution and attachment in aid of execution, in order to satisfy the Ungars' judgment against HAMAS. The assets of the HLF were blocked pursuant to Executive Orders 12947 and 13224 specifically because the HLF "*acts for or on behalf of*" HAMAS, and thus these assets are "blocked assets" of an agency and instrumentality of HAMAS subject to execution by plaintiffs under TRIA.[4]

56.    Accordingly, the District Court in Rhode Island expressly ruled, on the basis of the decisions of the District Court and Court of Appeals for the District of Columbia upholding

---

[2] Section 201(d)(1) of TRIA provides that the term "act of terrorism" includes any terrorist activity as defined in section 212(a)(3)(B)(iii) of the Immigration and Nationality Act (8 U.S.C. §1182(a)(3)(B)(iii)). The latter provision defines terrorist activity as "any activity which is unlawful under the laws of the place where it is committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any State) and which involves any of the following . . . The use of any . . . explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain), with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property [or] A threat, attempt, or conspiracy to do any of the foregoing."

[3] Section 201(d)(4) of TRIA provides that the term "terrorist party" includes a "terrorist organization" as defined in section 212(a)(3)(B)(vi) of the Immigration and Nationality Act (8 U.S.C. §1182(a)(3)(B)(vi). The latter provision defines a terrorist organization as including "an organization . . . that is a group of two or more individuals, whether organized or not, which engages in" terrorist activity."

[4] Section 201(d)(2) of TRIA provides that the term "blocked asset" includes any asset blocked pursuant to IEEPA. As noted, the Executive Orders blocking HLF's assets were issued pursuant to IEEPA.

the designation of the HLF as an SDT and SDGT and the findings therein, that the blocked assets

of the HLF are subject to execution in satisfaction of the Ungars' judgment:

> On December 4, 2001, the Office of Foreign Asset Control, a division of the
> Treasury Department, determined that the HLF acts "for or on behalf of" Hamas
> and was thus a Specially Designated Terrorist under Executive Order 12947 and a
> Specially Designated Global Terrorist under Executive Order 13224. Holy Land
> Found. for Relief and Dev. v. Ashcroft, 219 F. Supp.2d 57, 64 (D.D.C. 2002).
> These designations allowed the Treasury Department to block all of the HLF's
> funds, accounts, and real property. Id.
>
> The Terrorism Risk Insurance Act of 2002, ("TRIA") subjects the blocked assets
> of a terrorist party, and any agency or instrumentality of that terrorist party, to
> execution or attachment in order to satisfy a judgment against them on any claim
> based on an act of terrorism. Pub. L. No. 107-297, 116 §201(a), Stat. 2322 (2002).
> The HLF is an agency and instrumentality of Hamas because it acts "for or on
> behalf of" Hamas as Hamas' fund-raising agent in the United States. Therefore,
> the HLF's blocked assets are also subject to attachment and execution under the
> TRIA in order to satisfy the present judgment against Hamas.

Ungar, 304 F. Supp.2d at 241 (emphasis added).[5]

57.    Moreover, the United States District Court for the Northern District of Illinois has

recently ruled that that HLF is collaterally estopped from contesting the findings made by the

District Court and Court of Appeals for the District of Columbia upholding the designation of

the HLF as an SDT and SDGT. Boim v. Quranic Literacy Institute, 340 F. Supp.2d 885 (N.D.Ill.

2004).

58.    The HLF is therefore collaterally estopped from contesting the decisions and

findings of the District Court and Court of Appeals for the District of Columbia that served as

---

[5] This finding underlies the ruling by the Rhode Island district court that final judgment should enter against
HAMAS pursuant to FRCP 54(b) despite the pendency of the action against other defendants. The court found that
HLF's assets "are steadily depleting because the Treasury Department has allowed the HLF to use the assets to pay
its attorneys to challenge the blocking order and defend the HLF against a civil action arising from its collection of
funds for Hamas," and that this depletion of the limited pool of assets available to satisfy plaintiffs' judgment
constituted sufficient grounds for immediate entry of final judgment under Rule 54(b). Id. at 241-242.

the basis of the determination of the Rhode Island district court that the HLF is an agency and instrumentality of HAMAS within the meaning of TRIA.

59.    Additionally, HLF is collaterally estopped from contesting the Illinois district court's finding of estoppel.

60.    Thus, the HLF is an agency and instrumentality of HAMAS within the meaning of §201 of TRIA and the blocked assets of the HLF are subject to execution in satisfaction of the Ungars' judgment pursuant to §201 of the TRIA.

**f.    The Ungars' Enforcement Proceedings Under TRIA**

61.    On February 24, 2004, the Ungars registered their judgment in the United States District Court for the District of Columbia, and on February 25, 2004, they served the Treasury with a subpoena seeking information regarding the location of all blocked assets of HAMAS and HAMAS' agencies and instrumentalities.  In response to the Ungars' subpoena, the Treasury filed a motion stating that the information sought by the subpoena may be protected by the Trade Secrets Act, and declining to release the information without judicial authorization.

62.    On May 7, 2004, the U.S. District Court for the District of Columbia issued a protective order authorizing release of the information sought by the Ungars, subject to numerous restrictions governing the use and confidentiality of the information.

63.    On May 13, 2004, pursuant to the court order of May 7, the Treasury provided the Ungars with a list containing the details of all blocked assets of HAMAS and HAMAS' agencies and instrumentalities held by financial institutions in the United States including the assets of the HLF.

64.     The list provided by the Treasury indicated that blocked HLF funds totaling $5,045,037.80 are held by financial institutions in seven federal districts across the United States.

65.     Acting pursuant to the list provided by the Treasury, the Ungars then registered their judgment in the Southern District of New York, the Southern and Northern Districts of California, the Western District of Washington, the Northern District of Texas, the District of New Jersey, and the Northern District of Illinois, and retained local counsel in each of those districts.

66.     After the Ungars discovered that four of the HLF accounts identified by the Treasury as being in California were actually in South Carolina, they registered their judgment and retained local counsel in the District of South Carolina as well.

67.     On August 10, 2004, the Ungars filed in this Court an application with supporting declaration for issuance of a writ of execution against Hamas and the HLF pursuant to TRIA.

68.     On August 30, 2004, Judge Richard C. Casey of this Court entered an Order instructing the clerk of the court to issue a writ of execution in the form attached to his Order, and the clerk issued the writ in that form on September 1, 2004. Exhibit B.

The writ of execution issued by Judge Casey specifically provided that:

Pursuant to §201 of the Terrorism Risk Insurance Act of 2002, Public Law 107-297; 116 Stat. 2322, this Writ shall also be effective to execute upon the goods, chattels and other assets of The Holy Land Foundation for Relief and Development a/k/a The Holy Land Foundation ("HLF") in satisfaction of Plaintiffs' judgment against the Defendant, and the phrase "*goods, chattels and other assets of HAMAS - Islamic Resistance Movement a/k/a Harakat Al-Muqawama Al-Islamiyya*" appearing herein shall therefore also include goods, chattels and other assets of the HLF.

15

69.    Substantively identical writs of execution (with minor stylistic variations reflecting local practice) were issued by the United States District Court for the Western District of Washington (on September 2, 2004) and by the United States District Court for the District of South Carolina (on September 8, 2004).

70.    The Ungars did not require an OFAC license for their execution proceedings because §201 of TRIA, which permits execution against blocked assets "*Notwithstanding any other provision of law*," overrides the IEEPA blocking regime.

71.    Accordingly, "*No license by the Office of Foreign Assets Control of the U.S. Treasury Department is required as a precondition*" to an execution under TRIA. Daliberti v. J.P Morgan Chase & Co., 2003 WL 340734 at 2 (S.D.N.Y. 2003). Indeed, the federal courts have without exception authorized executions under TRIA without any OFAC license. See e.g. Hill v. Republic of Iraq, 2003 U.S. Dist. LEXIS 3725 (D.D.C. March 11, 2003); Weinstein v. Islamic Republic of Iran, 274 F. Supp.2d 53 (D.D.C. 2003).

72.    Most recently, in an execution proceeding brought under §201 of TRIA in the U.S. District Court for the Northern District of Texas (Amarillo) against a property in Lubbock owned by Iran and blocked under IEEPA, the Justice Department notified the court that, "under the current legal framework, the United States is not in a position to interpose any objection to the seizure and sale of the property . . . " Notice of the United States, filed in Rubin v. Islamic Republic of Iran, (Civil No. 2-03MC-0014J N.D. Texas). Exhibit C.

73.    Accordingly, the Amarillo federal district court ordered the sale of the property, and on January 4, 2005, the property was sold by the U.S. Marshal and the proceeds transferred

to the Rubin plaintiffs—all with no OFAC license. See Docket nos. 12-15, in Rubin, *supra*, Civil No. 2-03MC-0014J.

g.    **The Government's Criminal and Forfeiture Proceedings Against HLF**

74.    Following the HLF's designation as a terrorist group and the blocking of its assets, the government pursued a criminal investigation of HLF.

75.    In early April, 2002, the U.S. District Court for the Northern District of Texas (Dallas) issued four search warrants permitting federal agents to examine documents and moveable property of the HLF seized by OFAC from HLF's offices and held in storage facilities in Dallas, San Diego, Newark and Mundelein, Illinois. See Docket nos. 1-5 in USA v. 11025 Switzer Ave. et al., 3:02-MJ-119; Docket no. 94 in USA v. Holy Land Foundation, 04-cr-00240.

76.    However, because the HLF's property is blocked under IEEPA, the warrants issued by the Dallas federal court were ineffective to permit the FBI to conduct the searches. The Justice Department was therefore required to seek a license from OFAC, permitting execution of the search warrants issued by the federal court. Accordingly, on April 9, 2002, OFAC issued a "Directive License" (No. SDGT-53) permitting the FBI (which OFAC defines therein as a "licensee") to access, examine, copy and remove HLF's property "in furtherance of a criminal search warrant." Exhibit D.

77.    On July 26, 2004, the United States filed a forty-two count indictment against the HLF and its principals in the Dallas federal district court ("indictment"). USA v. Holy Land Foundation, 04-cr-00240.

78.    The indictment includes a demand for forfeiture of $12,400,000 in tainted assets, as well as a demand for forfeiture of substitute assets.

79. However, the filing of the indictment and forfeiture demand could not purport to, and did not, have any legal effect on the blocked HLF funds, because (as noted) the executive blocking orders and regulations prohibit and nullify *ab initio* any and all unlicensed dispositions in blocked property. 31 CFR §§594.202 and 595.202.[6]

80. Accordingly, on September 23, 2004, OFAC issued a License (No. SDGT-382) authorizing the Department of Justice "to pursue criminal forfeiture of the assets of the Holy Land Foundation for Relief and Development ("HLF") blocked pursuant to" Executive Orders 12947 and 13224 ("Forfeiture License"). Exhibit E.

81. Thus, the first date on which the forfeiture demand contained in the indictment could possibly have become legally effective in respect to the blocked HLF assets was September 23, 2004, when OFAC authorized the forfeiture proceedings.

82. The Forfeiture License further provided that, "This authorization includes the pursuit of restraining orders necessary to preserve the status of the Blocked Assets prior to their forfeiture or other final disposition." Id.

83. And indeed, the next day, September 24, 2004, the United States Attorney filed in USA v. Holy Land Foundation, a pleading styled as "Government's *Ex Parte* Application For Post-Indictment restraining order," (hereinafter "*Ex Parte* Application"), accompanied by a proposed order. Exhibit F.

84. The *Ex Parte* Application sought a restraining order, pursuant to 21 U.S.C. §853(e)(1)(A), "to preserve the availability of certain property that is subject to forfeiture" in the criminal action and identifies the "certain property" whose restraint is sought as blocked HLF

---

[6] In any event, the indictment does not allege that the blocked HLF funds in the United States are tainted assets.

funds held by "various financial institutions" listed in a document labeled "Attachment A" and appended to the *Ex Parte* Application. Id. at pages 1-2.

85.     Significantly, the *Ex Parte* Application dedicates a full page to the Ungars' enforcement proceedings under TRIA, and specifically argues that a restraining order is necessary to prevent the Ungars from reaching the blocked HLF funds. Id. at p. 3.

86.     Indeed, the Ungars' enforcement proceedings are cited by the government as the first and main ground for granting its Application, and halting the Ungars' proceedings is presented as the very raison d'être of the requested restraining order.

87.     That day, September 24, 2004, the Dallas federal court granted the *Ex Parte* Application and issued a Post-Indictment restraining order in the form proposed and submitted by the U.S. attorney. Exhibit G.

      **h.**    **The Respondent Banks' Response to the restraining order**

88.     In light of the restraining order, which purports to remain in force indefinitely, the respondent banks have refused to comply with the writ of execution issued by this Court.

      **i.**    **The Ungars' Appeal**

89.     The restraining order is void and/or of no effect for several reasons, set forth fully below.

90.     The Ungars had, and continue to have, the option of contesting the restraining order either in this Court (and in the other district courts in which they have initiated execution proceedings against HLF), or in the Court of Appeals for the Fifth Circuit, or in all the fora in parallel.

91.    Indeed, as discussed below, in virtually identical circumstances the Fifth Circuit itself affirmed a decision by the district court for the Canal Zone granting a creditor's request to disregard a restraining order issued by a federal district court in Illinois that purported to halt execution proceedings pending in the Canal Zone court. Wong Shing v. M/V Mardina Trader, 564 F.2d 1183, 1188 (5th Cir. 1978). The Ungars were (and are) entitled to ask this Court to take the same course.

92.    Nevertheless, in order to prevent a multiplicity of proceedings and to preserve their limited resources, and out of respect for the Dallas federal court and the Court of Appeals for the Fifth Circuit, the Ungars decided to appeal the restraining order in that circuit. The Ungars' appeal remains pending in the Fifth Circuit.

93.    However, the Ungars' attempt to litigate the validity of the restraining order in the Fifth Circuit may prove to be in vain, due the position of the government itself: in a brief recently submitted by the Justice Department in response to a motion for summary disposition of the appeal filed by the Ungars, the government has now asserted that the Ungars have no standing to contest the restraining order in the Dallas district court or the Fifth Circuit. The government's response brief indicates that it intends to expand on this standing argument in its appellate brief.

94.    Thus, if the government's argument that the Ungars' have no standing to contest the restraining order in either the Fifth Circuit or the Dallas district court is accepted by the Fifth Circuit, the Ungars will have no recourse but to challenge the validity and force of the restraining order in this Court and the other district courts in which petitioners have commenced execution proceedings.

20

95.    Effectively, the Justice Department is insisting (for reasons known only to it) on litigating the force and effect of the restraining order in several different district courts across the country.

96.    Therefore, out of an abundance of caution and to preserve their rights in the event that the government's standing argument prevails in the Fifth Circuit and/or that the Fifth Circuit declines to reach some or all of petitioners' arguments, petitioners have been compelled to file the instant action.

## THE RESTRAINING ORDER IS VOID AND/OR INEFFECTIVE TO PREVENT PETITIONERS' ENFORCEMENT PROCEEDINGS UNDER §201 OF TRIA

97.    The restraining order is void and/or ineffective to prevent petitioners' enforcement proceedings for at least three[7] reasons:

### a.    The Blocked HLF Funds Were in the Custody of This Court (*in custodia legis*) at the Time That the restraining order was Issued and the Dallas District Court Therefore Lacked Jurisdiction to Issue the restraining order

98.    It is long settled that:

[W]here a court of competent jurisdiction has, through its officers, taken property into its possession, the property is thereby withdrawn from the jurisdiction of other courts. Having possession, the court may not only issue all writs necessary to protect its possession from physical interference, but is entitled to determine all questions respecting the same.

Ex parte Baldwin, 54 S.Ct. 551, 553 (1934).

99.    The Fifth Circuit itself has repeatedly reiterated this rule. See e.g. Wong Shing v. M/V Mardina Trader, 564 F.2d 1183, 1188 (5th Cir. 1978) ("When a court of competent jurisdiction takes possession of property through its officers, that property is withdrawn from the

---

[7] In their pending appeal to the Fifth Circuit petitioners also assert that the blocked HLF assets cannot be restrained pursuant to 21 U.S.C. §853(e)(1)(A) because they are not alleged in the indictment filed against HLF to be "tainted"

jurisdiction of all other courts."); In re Rehkopf Mattress Sales, Inc., 479 F.2d 67, 70 (5th Cir. 1973) (noting the "general rule that when a court of competent jurisdiction takes possession of property through its officers, that property is withdrawn from the jurisdiction of all other courts which, though of concurrent jurisdiction, may not disturb that possession.").

100.    This rule is commonly known as the *in custodia legis* doctrine. See e.g. Ciel y Cia S.A. v. Nereide Societa di Navigazione per Azioni, 28 B.R. 378, 381 (E.D.Va. 1983) (holding that after property "has been seized by the Marshal under *in rem* process" in one court, the *in custodia legis* doctrine trumps even bankruptcy proceedings, and exclusive jurisdiction over the property lies with the first court rather than the bankruptcy court).

101.    The *in custodia legis* doctrine controls the instant case because on September 24, 2004, when the restraining order was issued, the blocked HLF funds held by the respondent banks were already in the custody of this Court.

102.    On September 1 and 2, 2004, the U.S. Marshal for the Southern District of New York levied the writ of execution issued by this court on the respondent banks. Exhibit H.

103.    Under New York law, the levying of a writ of execution places the subject assets within the legal custody of the court. See e.g. Ruvolo v. Long Island R. Co., 45 Misc.2d 136, 144, 256 N.Y.S.2d 279, 287 (1965) ("Actual possession by the Sheriff or removal from the premises of the debtor was in no way required. 'Once levied upon the property is deemed to be *in custodia legis*.')(quoting Matter of Livingston, 30 Misc.2d 71, 74, 211 N.Y.S.2d 897, 900, affd. on other grounds 14 AD2d 264, 220 N.Y.S. 434 (1961)); Sheridan Farms, Inc. v. Federico, 48 Misc.2d 599, 265 N.Y.S.2d 922 (App.Term 1st Dep't, 1965) ("The property was inventoried

assets.

by the marshal and the debtor put on notice that it was being levied upon pursuant to the execution lodged with the marshal, who left with the debtor copies of the execution, inventory and notice of sale and posted a notice of levy. The marshal thereby exercised dominion and took custody of the property pursuant to the levy and it passed from the debtor's custody and was placed in custodia legis.").

104.    Rule 69(a) of the Federal Rules of Civil Procedure provides that execution proceedings in a federal court are governed by state law, and the question of whether property is *in custodia legis* of a federal court is therefore controlled by the law of the state in which it sits. See e.g. U.S. v. Powell, 639 F.2d 224, 225 (5th Cir. 1981) (holding that execution against funds held in registry of a Texas federal court is governed by Fed.R.Civ.P. 69(a) which in turn requires the application of Texas law including *custodia legis* doctrine as recognized in Texas law).

105.    Thus, in early September 2004, the blocked HLF assets held by the respondent banks were in the custody of this Court, and those funds were thereby "***withdrawn from the jurisdiction of all other courts***." Wong Shing, 564 F.2d at 1188.

106.    The District Court for the Northern District of Texas therefore lacked jurisdiction to issue an order restraining those funds on September 24, 2004.[8]

107.    Indeed, the facts of Wong Shing are substantively identical to those presented in the instant case:

108.    The United States Marshal had seized a vessel pursuant to enforcement proceedings brought in the U.S. district court for the Canal Zone. A third-party (a trustee acting for other creditors of the ship owners) then successfully moved a federal court in Illinois to issue

---

[8] Also, as noted, the earliest possible date on which the forfeiture demand contained in the indictment became legally effective was September 23, 2004, when OFAC issued the Forfeiture License.

a restraining order prohibiting the sale of the vessel. The district court in the Canal Zone court ordered the United States Marshal to disregard the Illinois restraining order and to proceed with the sale.

109.    The Fifth Circuit affirmed the decision of the district court in the Canal Zone to ignore the restraining order, and expressly held that the Illinois federal court was <u>without jurisdiction</u> to issue the restraining order since, "When a court of competent jurisdiction takes possession of property through its officers, that property is withdrawn from the jurisdiction of all other courts." <u>Id</u>. at 1188.

110.    Exactly so here: once this Court took possession of the blocked HLF funds within its jurisdiction, the district court for the Northern District of Texas was without jurisdiction to issue a restraining order in respect to those funds. This Court alone is "*entitled to determine all questions respecting*" those assets. <u>Baldwin</u>, 54 S.Ct. at 553.

111.    The restraining order is therefore void *pro tanto* for lack of jurisdiction, to the extent that it purports to restrain the blocked HLF funds held by the respondent banks.

**b.    Section 201 of TRIA Permits Execution Against the Blocked HLF Funds Notwithstanding the Government's Forfeiture Proceedings, and the restraining order is Therefore Void and/or Ineffective to the Extent it Purports to Prevent Enforcement Proceedings Pursuant to TRIA**

112.    All blocked HLF assets are subject to execution by the Ungars under §201 of TRIA, even assuming *arguendo* that they were not already within the custody of this Court.

113.    As noted, §201 of TRIA permits attachments and executions "Notwithstanding any other provision of law," and its clear remedial purpose is to assist American victims of terrorism to enforce judgments against terrorist parties:

> The TRIA was . . . specifically intended "to deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism in any court of competent jurisdiction by enabling them to satisfy such judgments through the attachment of blocked assets of terrorist parties." 148 Cong. Rec. H8728 (Nov. 13, 2002).

Hill, 2003 WL 21057173 at 2.

114.     The case law applying and interpreting §201 of TRIA clearly establishes that the

"notwithstanding" provision of §201 operates to <u>override all statutory limitations</u> on attachment

and execution:

> This matter concerns the efforts of plaintiffs, 180 individuals in whose favor default judgments have been entered against the Republic of Iraq ("Iraq"), to satisfy those judgments [against] accounts . . . that are held by garnishee Riggs Bank NA in the name of the Embassy of Iraq Commercial Office (the "Iraqi Accounts"). <u>Both of these accounts have been blocked since August 2, 1992 pursuant to Executive Order No. 12722 and the International Emergency Economic Powers Act. 50 U.S.C. §§1701-02.</u> Plaintiffs have moved this Court for issuance of an order directing execution against those accounts. The Court finds that each of these accounts is subject to execution under the Terrorism Risk Insurance Act ("TRIA") . . .
>
> Section 201 of the TRIA states that "[n]otwithstanding any other provision of law," the blocked assets of a terrorist party "shall be subject to execution or attachment in aid of execution." <u>As this Court has frequently recognized, "the phrase 'notwithstanding any other provision of law,' or a variation thereof, means exactly that: it is unambiguous and effectively supersedes all previous laws."</u> *Energy Transp. Group, Inc v. Skinner,* 752 F.Supp. 1, 10 (D.D.C. 1990); *see also Crowley Caribbean Transp., Inc. v. United States,* 865 F.2d 1281, 1283 (D.C.Cir. 1989) ("[a] clearer statement [than 'notwithstanding any other provision of law'] is difficult to imagine"). <u>Accordingly, by its plain terms, the TRIA overrides any immunity from execution that blocked Iraqi property might otherwise enjoy under the Vienna Convention [on Diplomatic Relations] or the FSIA.</u>

Hill, 2003 WL 21057173 1-2 (emphasis added).

115.     Similarly, in <u>Hegna v. Islamic Republic of Iran</u>, 376 F.3d 485 (5th Cir. 2004), the

Fifth Circuit affirmed that (subject to a narrow exception)[9] TRIA overrides the immunity

---

[9] I.e., that the property is being used exclusively for diplomatic or consular purposes. <u>Hegna</u>, 376 F.3d at 494.

provisions of the Vienna Convention and permits execution against diplomatic property subject to the Convention.

116.    Thus, TRIA's "notwithstanding" language overrides (1) executive blocking orders issued pursuant to IEEPA (2) the FSIA and (3) the Vienna Conventions.  This fact is extremely significant, because the federal courts have consistently held that IEEPA, the FSIA, and the Vienna Convention are themselves all legal regimes of superior and overriding normative force:

117.    In Charles T. Main Intern., Inc. v. Khuzestan Water & Power Authority, 651 F.2d 800 (1st Circuit 1981), the First Circuit held that, "*The language of IEEPA is sweeping and unqualified*," and that the IEEPA blocking regime empowers the President to override judicial remedies, such as attachments and injunctions, and to extinguish "interests" in foreign assets held by United States citizens. Id. at 807.

118.    In Dames & Moore v. Regan, 101 S.Ct. 2972, 2983 (1981), the Supreme Court explained the legislative purpose behind the IEEPA blocking regime:

> This Court has previously recognized that the congressional purpose in authorizing blocking orders is "to put control of foreign assets in the hands of the President . . . " *Propper v. Clark*, 337 U.S. 472, 493, 69 S.Ct. 1333, 1345, 93 L.Ed. 1480 (1949). Such orders permit the President to maintain the foreign assets at his disposal for use in negotiating the resolution of a declared national emergency.

119.    Quoting with approval the holding in Charles T. Main that IEEPA's provisions are "sweeping and unqualified" (Id. at 2982), the Supreme Court upheld the validity of orders issued by the President under IEEPA which extinguished third-party rights in Iranian property:

> Because the President's action in nullifying the attachments and ordering the transfer of the assets was taken pursuant to specific congressional authorization, it

26

is supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it.

Dames, 101 S.Ct. at 2984 (internal quotes omitted).

120.    The overwhelming normative force of IEEPA and blocking orders issued pursuant thereto has been recognized by a long series of cases, including a recent decision of the Fifth Circuit:

> The <u>IEEPA grants the President sweeping powers</u> to prohibit "any person['s]" participation in any transaction involving or the exercise of any right, power, or privilege with respect to any "property in which any foreign country . . . has any interest." See 50 U.S.C. §1702(a)(1)(B). Pursuant to this broad authority, President Reagan authorized a freeze on all property and interests in property of the GOL and its agencies, controlled entities and instrumentalities that are in the United States or hereafter come into the possession or control of U.S. persons . . . <u>In matters like this, which involve foreign policy and national security, we are particularly obliged to defer to the discretion of executive agencies interpreting their governing law and regulations.</u>

Paradissiotis v. Rubin, 171 F.3d 983, 988 (5th Cir. 1999).

121.    Thus, §201 of TRIA is truly revolutionary. Until the enactment of TRIA, the normative force of IEEPA reigned supreme over all other legal norms, and permitted the President to utilize his "sweeping powers" to exercise total dominion over foreign assets and override the rights of all third-parties vis-à-vis such assets. Indeed, as noted, even the FBI and the U.S. Attorney are unable to execute a search warrant issued by a federal court against blocked assets, or to seek judicial forfeiture or restraint of such assets, without first obtaining licenses from OFAC.

122.    No longer: since the enactment of §201, the Ungars and other victims of terrorism are entitled to override IEEPA blocking orders, and to attach and execute freely against assets blocked pursuant to IEEPA, without any OFAC license.

27

123. Since TRIA's "Notwithstanding any other provision of law" proviso overrides even the "sweeping" national security provisions of IEEPA which are "supported by the strongest of presumptions and the widest latitude of judicial interpretation" (Dames at 2984) that "notwithstanding" proviso must *a fortiori* trump any and every garden-variety "provision of law" governing forfeitures. [10]

124. This interpretation is not only mandated by the peremptory "notwithstanding" language of §201, it is also demanded by TRIA's legislative purpose. Congress did not arm victims of terrorism such as the Ungars with a statute that overrides even the overwhelming – and heretofore insuperable – national security powers of the President under IEEPA, only to leave them vulnerable to common forfeiture proceedings. Indeed, in virtually every imaginable case, the blocked U.S.-based assets of terrorist organizations subject to execution under §201 would also be potentially subject to some type of forfeiture. Thus, an interpretation that reads into TRIA's "notwithstanding" language an unwritten exception for forfeiture provisions would effectively permit the government to thwart virtually all TRIA enforcements by the simple expedient of initiating forfeiture proceedings.

125. Such a result would utterly contradict and defeat Congress' express intent in enacting TRIA.

126. This analysis is also strongly supported by the fact that TRIA overrides the FSIA and the Vienna Conventions:

---

[10] Or, stated somewhat differently, as a transitive principle of logic: since TRIA is normatively superior to IEEPA (no OFAC license required for execution), and IEEPA is normatively superior to the provisions governing forfeitures (OFAC license required for forfeiture) then TRIA is *per force* normatively superior to the forfeiture provisions and permits attachment and execution "notwithstanding" those forfeiture provisions.

127.    The FSIA "sets forth the sole and exclusive standards to be used in resolving questions of sovereign immunity raised by foreign states before Federal and State courts in the United States."   H.R.Rep. No. 94-1487, 94th Cong., 2d Sess. (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6610.

128.    Moreover, exceptions to immunity are construed narrowly. See e.g. Sampson v. Federal Republic of Germany, 250 F.3d 1145, 1156 (7th Cir. 2001); Mendenhall v. Saudi Aramco, 991 F.Supp. 856, 858 (S.D.Tex. 1998) (citing cases).

129.    Section 1609 of the FSIA provides: "Subject to existing international agreements to which the United States is a party at the time of enactment of this Act the property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter." 28 U.S.C. §1609.

130.    Yet, as noted, "the TRIA overrides any immunity from execution that blocked Iraqi property might otherwise enjoy under. . . the FSIA." Hill at 2.

131.    Thus, the "notwithstanding" language of §201 overrides even the provisions of §§1610-11 of the FSIA which were – until the enactment of TRIA – "the sole and exclusive standards" governing the immunity of the property of foreign states.

Likewise:

> There is . . . a firm and obviously sound canon of construction against finding implicit repeal of a treaty in ambiguous congressional action. A treaty will not be deemed to have been abrogated or modified by a later statute unless such purpose on the part of Congress has been clearly expressed.

Trans World Airlines v. Franklin Mint Corp., 104 S.Ct. 1776, 1782 (1984) (internal quotation marks omitted).

132.    Therefore, only a "clearly expressed" enactment by Congress can overcome the immunity granted to diplomatic property under the Vienna Conventions.

133.    As noted, the Fifth Circuit (in <u>Hegna</u>) and the <u>Hill</u> court both found that §201 of TRIA overrides the Vienna Conventions.

134.    Thus, here too: since TRIA's "notwithstanding" language is effective to override the presumptions against any derogation from the broadly construed norms contained in the FSIA and the Vienna Conventions, it is per force effective to defeat any run-of-the-mill provisions of law governing forfeitures.

135.    Therefore, §201 of TRIA overrides any provision of law governing or permitting forfeitures, and any forfeiture proceedings brought pursuant thereto are ineffective to defeat or interfere with the Ungars' right to attach and execute under TRIA. Thus, the restraining order is void and/or of no effect to the extent that it purports to prevent the Ungars' TRIA proceedings.

    c.    **The restraining order Was Given in Violation of Rule 65 of the Federal Rules of Civil Procedure and the Fifth Amendment and In Any Case Has Expired by Operation of Rule 65**

136.    The Dallas district court entered the restraining order on the basis of 21 U.S.C. §853(e)(1)(A).

137.    As the Fifth Circuit reiterated just recently:

[T]he requirements of Federal Rule of Civil Procedure 65, including Rule 65's hearing requirements and time limits on ex parte restraining orders, apply to ex parte restraining orders and injunctions issued under 21 U.S.C. §853(e)(1)(A). *See United States v. Thier*, 801 F.2d 1463, 1468-69 (5th Cir. 1986), *modified*, 809 F.2d 249 (5th Cir. 1987); *accord United States v. Crozier*, 777 F.2d 1376, 1384 (9th Cir. 1985).

<u>U.S. v. Melrose East Subdivision</u>,  357 F.3d 493, 500 (5th Cir. 2004).

138.    In <u>U.S. v. Thier</u>, 801 F.2d 1463, 1468-69 (5th Cir. 1986) the Fifth Circuit explained that the "irreparable loss" and "notice" requirements of Rule 65 are satisfied, in respect to a criminal defendant, by the exigencies of a criminal proceeding and the filing of an indictment.

139.    As discussed, however, the restraining order in this case was aimed entirely at the Ungars, not at the criminal defendant – i.e. the HLF. (Indeed, the HLF itself cannot deplete the assets because they are blocked). Therefore, there was no legal basis under Rule 65 to enter an *ex parte* restraining order. The Ungars should have been provided prior notice and a hearing as required by Rule 65, and the failure to do so renders the restraining order void.

140.    Moreover, the failure to provide notice and a hearing before purporting to extinguish the Ungars' execution proceedings violated their Fifth Amendment due process rights, and for this reason, too, the restraining order is void. <u>See e.g.</u> <u>U.S. v. Melrose East Subdivision</u>, 357 F.3d at 499 ("authorities interpreting . . . 21 U.S.C. §853(e), are in broad agreement that due process requires the district court to hold a prompt hearing at which the property owner can contest the restraining order")(citing cases); <u>United States v. Roth</u>, 912 F.2d 1131, 1132 (9th Cir. 1990); <u>United States v. Crozier</u>, 777 F.2d 1376 (9th Cir. 1985).

141.    In any case, under Rule 65 an ex parte restraining order expires automatically after ten days. <u>See e.g.</u> <u>Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 of Alameda County</u>, 94 S.Ct. 1113, 1124 (1974) (restraining order expired automatically under Rule 65 after ten days); <u>U.S. v. Thier</u>, 801 F.2d 1463, 1468-69 (5th Cir. 1986) ("an *ex parte* restraining order is effective for a maximum of ten days").

142.    Thus, even assuming *arguendo* that it was ever valid, the restraining order expired ten days after it was given on September 24, 2004, and is now of no force or effect.

143.    Therefore, the respondent banks have no grounds to regard the restraining order as legally valid or effective and must comply with the writ of execution issued by this Court.

**COUNT I**
**BY ALL PETITIONERS AGAINST ALL RESPONDENTS**
**TURNOVER**

144.    The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

145.    Respondent HLF is an agency and instrumentality of HAMAS within the meaning of TRIA §201 and its blocked assets are subject to attachment and execution in satisfaction of petitioners' judgment pursuant to §201 of TRIA.

146.    The respondent banks hold blocked assets of the HLF.

147.    The respondent banks were served with a writ of execution issued by this Court directing them to transfer to the United States Marshal for turnover to petitioners all HLF assets in their possession.

148.    The respondent banks have refused to comply with the writ of execution in light of the restraining order issued by the United States District Court for the Northern District of Texas on September 24, 2004.

149.    The restraining order is void and ineffective to prevent petitioners' execution proceedings against the blocked HLF assets and does not legally restrain the respondent banks from complying with the writ of execution issued by this Court.

150.    There is no legal or other obstacle preventing the respondent banks from complying with the writ of execution issued by this Court.

151.    Petitioners are therefore entitled to judgment determining that the blocked assets of HLF are subject to execution and attachment in aid of execution in satisfaction of their judgment and ordering the respondent banks to transfer to the United States Marshal for turnover to petitioners all HLF assets in their possession.

WHEREFORE, petitioners respectfully demand judgment against respondents

(i) Determining that the blocked assets of HLF are subject to execution and attachment in aid of execution in satisfaction of petitioners' judgment and ordering the respondent banks to transfer to the United States Marshal for turnover to petitioners all HLF assets in their possession; and

(ii) Awarding petitioners their costs, expenses, disbursements and attorney's fees in connection with this proceeding, together with such other and further relief that this Court deems just, proper and equitable.

Dated: New York, New York,
April 11, 2005

Plaintiffs,
By their attorneys,

Lee Squitieri
32 East 57th Street, 12th Floor
New York, NY 10022
(212) 421-6492
(212) 421-6553

33

David J. Strachman
McIntyre, Tate, Lynch & Holt
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095