YORK (HSBC), CHASE BANK OF TEXAS – J.P. MORGAN CHASE & CO. and CITIBANK ("respondent banks") all of which hold funds belonging to HLF.

4. In response to the levy of petitioners' writ, on September 24, 2004, the Department of Justice filed an *ex parte* application in the federal district court for the Northern District of Texas (Dallas) for a restraining order pursuant to 21 U.S.C. §853(e)(1)(A) prohibiting any disposition in HLF's accounts, on the explicit and primary ground that such an order was necessary in order to halt petitioners' enforcement proceedings.

5. The Dallas federal court issued the requested restraining order *ex parte* the same day ("restraining order").

6. The *ex parte* restraining order purports to remain in force indefinitely, and the respondent banks have therefore refused to comply with the writs of execution.

7. As discussed in full detail *infra*, the restraining order is void and/or ineffective to prevent petitioners' execution proceedings against the HLF funds held by the respondent banks, and the respondent banks are thus obligated to comply with the writ of execution issued by this Court and to remit the HLF funds to the petitioners.

8. Petitioners therefore bring this action pursuant to CPLR 5225 and 5227 for a judgment ordering the respondent banks to transfer all HLF funds held by them to the United States Marshal for turnover to the petitioners.

### JURISDICTION AND VENUE

9. This Court has jurisdiction over this matter pursuant to 28 U.SC. §§ 1331, 1367 and 2201, §201 of the Terrorism Risk Insurance Act of 2002, Fed.R.Civ.P. 69, CPLR 5225 and 5227, and the Court's ancillary enforcement jurisdiction.

10. This Court has jurisdiction over respondents pursuant to Fed.R.Civ.P. 4(k) and CPLR 301 and 302.

11. The Southern District of New York is the proper venue for this action pursuant to 28 U.S.C. §1391(b) since a substantial part of the property that is the subject of this action is situated in this district, and is *in custodia legis* in this Court.

## THE PARTIES

12. Petitioner THE ESTATE OF YARON UNGAR, which is represented in this action by a court-appointed administrator, attorney David Strachman, holds a judgment against HAMAS in the amount of $2,932,158.00.

13. Petitioners DVIR UNGAR and YISHAI UNGAR, minors who bring this action through their grandparents and legal guardians petitioners Meir Ungar, Judith Ungar, Uri Dasberg and Judith Dasberg, each hold a judgment against HAMAS in the amount of $30,488,482.50.

14. Petitioners PROFESSOR MEIR UNGAR and JUDITH UNGAR, who bring this action individually and in their capacity as legal guardians of petitioners Dvir and Yishai Ungar, each hold a judgment against HAMAS in the amount of $15,000,000.00.

15. Petitioners RABBI URI DASBERG and JUDITH DASBERG bring this action in their capacity as legal guardians of petitioners Dvir and Yishai Ungar.

16. Petitioners AMICHAI UNGAR, DAFNA UNGAR and MICHAL COHEN each hold a judgment against HAMAS in the amount of $7,500,000.00.

17. Upon information and belief, respondent MORGAN STANLEY is a corporation which transacts business in New York and has offices at 1221 Avenue of the Americas 4th Fl, New York, New York.

18. Upon information and belief, respondent REPUBLIC BANK OF NEW YORK (HSBC) is a corporation which transacts business in New York and has offices at 452 Fifth Ave, New York, New York.

19. Upon information and belief, respondent CHASE BANK OF TEXAS—J.P. MORGAN CHASE & CO. is a corporation which transacts business in New York and has offices at 270 Park Avenue, New York, New York.

20. Upon information and belief, respondent CITIBANK is a corporation which transacts business in New York and has offices at 425 Park Avenue, New York, New York.

21. Upon information and belief, respondent HOLY LAND FOUNDATION FOR RELIEF AND DEVELOPMENT is a corporation organized under the laws of California which holds assets and transacts business in New York.

## STATEMENT OF FACTS

a. **Petitioners' Judgment**

22. Petitioners are the orphaned children, parents, siblings and administrator of the estate of U.S. citizen Yaron Ungar, who was murdered along with his pregnant wife Efrat in a terrorist machine-gun attack carried out by the HAMAS terrorist organization (also known as "The Islamic Resistance Movement") on June 9, 1996 in Israel.

23. A 25 year-old New York native, Yaron was a schoolteacher studying for rabbinical ordination when he was murdered. The Ungars were ambushed while returning from a

wedding. Efrat shielded their ten month-old son Yishai from the bullets and he survived the attack. The Ungars' other son Dvir, then two years old, was not in the vehicle.

24.     In March 2000, the Ungars filed suit against HAMAS and other defendants in the United States District Court for the District of Rhode Island under the Antiterrorism Act ("ATA") 18 U.S.C. §2331 et seq.

25.     Section 2333(a) of the ATA creates a cause of action for a U.S. national, or his estate, survivors and heirs, injured by reason of an act of *"international terrorism"* as defined in §2331.

26.     The Ungars' suit was (to the best of their knowledge) the first civil action brought under the ATA.[1]

27.     HAMAS defaulted the action, but the Rhode Island federal court did not proceed immediately to default judgment. Instead, the court required the Ungars to submit evidence that HAMAS has contacts with the United States sufficient under the 5th Amendment to permit the exercise of in personam jurisdiction, and instructed the Ungars to extensively brief the yet-unexamined question of the scope of damages allowed under the ATA.

28.     The court also conducted a damages hearing over several days in July 2002, at which the Ungars and several expert witnesses testified about the details of the murder, Yaron's conscious suffering before death (Efrat was killed instantly), and the economic, emotional and psychological impact that the murder has had on Dvir and Yishai, and the other immediate members of the Ungar family. See Ungar v. The Palestinian Authority, 304 F. Supp.2d 232, 243-279 (D.R.I. 2004).

---

[1] Other plaintiffs have followed the Ungars' lead. See e.g. Boim v. Quranic Literacy Institute, 291 F.3d 1000 (7th Cir. 2002); Rubin v. Hamas, 2004 WL 2216489 (D.D.C. September 27, 2004).

6

29. On July 3, 2003, Magistrate Judge David L. Martin issued a treatise-like Report and Recommendation ("Report"), stretching to nearly forty pages, detailing the basis for the court's exercise of personal jurisdiction over HAMAS, analyzing the scope of damages permitted under the ATA and recommending entry of default judgment against HAMAS in the amount of $116,409,123 in damages, plus pre-judgment interest. See Report and Recommendation attached to Ungar, 304 F. Supp.2d at 243-279.

30. The Report specifically noted the great effort invested by the Ungars and their counsel in briefing the numerous issues of first impression raised by the suit. Id. at 278 ("[T]his litigation presented special challenges. There was little precedent to follow. Plaintiffs' counsel had to travel to Israel to gather evidence to support the claims being made.")

31. The district judge did not immediately adopt the Report, but instead instructed the Ungars to brief the question of whether pre-judgment interest was available under the ATA. Id. at 236.

32. On January 27, 2004, Senior U.S. District Judge Ronald R. Lagueux issued a Memorandum and Order adopting the magistrate's Report (except regarding pre-judgment interest) and entering final judgment for the plaintiffs against HAMAS for $116,409,123.00 in damages, plus attorney's fees and costs. Id. at 242-243.

33. Thus, the Ungars received a judgment against HAMAS nearly **four years** after filing suit, and only after investing very considerable financial and emotional resources and reliving through testimony the excruciating details of the terrorist murder and its aftermath.

b. **HAMAS and HAMAS' Agencies and Instrumentalities**

34. At all times relevant hereto HAMAS is and was a composite and/or umbrella organization constituted of both natural persons and various legal persons, including a number of corporations and unincorporated associations which serve as agencies, instrumentalities and organs of HAMAS ("HAMAS agencies and instrumentalities").

35. At all times relevant hereto HAMAS' agencies and instrumentalities are and were utilized by HAMAS' leadership to raise and distribute funds.

36. At all times relevant hereto, a number of HAMAS agencies and instrumentalities raised funds in North America, Europe and elsewhere and transferred those funds to other HAMAS agencies and instrumentalities located in the West Bank and Gaza Strip which then distributed those funds to HAMAS' terrorist operatives and cells.

37. At all times relevant hereto respondent Holy Land Foundation ("HLF") is and was one of HAMAS' agencies and instrumentalities, assigned by the HAMAS leadership with the task of raising funds for HAMAS in the United States.

38. HLF was established by HAMAS for the purpose of raising funds for HAMAS in the United States.

39. Since its establishment and at all times relevant hereto, the HLF raised funds for HAMAS in the United States and transferred those funds to its sister HAMAS agencies and instrumentalities in the West Bank and Gaza.

40. At all times relevant hereto, the HLF was controlled by HAMAS and its leadership, and/or operated under the control and/or direction and/or pursuant to the instructions of HAMAS and the HAMAS leadership, and was an organ and/or agent of HAMAS.

    c.    **The Blocking of Assets Belonging to HAMAS and HAMAS' Agencies and Instrumentalities in the United States**

41.     The International Emergency Economic Powers Act, 50 U.S.C. §1701 *et seq.* ("IEEPA") authorizes the President, under certain conditions, to block any property subject to the jurisdiction of the United States. 50 U.S.C. §1702.

42.     On January 23, 1995, the President issued Executive Order 12947 (60 Fed. Reg. 5079) pursuant to IEEPA. Executive Order 12947 designated HAMAS as a "Specially Designated Terrorist" or SDT, and blocked its assets. Executive Order 12947 also provides for other persons or organizations to be designated as SDTs and thereby have their assets blocked, if found to be *"owned or controlled by, or to act for or on behalf of"* HAMAS. Id.

43.     On September 23, 2001, the President issued Executive Order 13224 pursuant to IEEPA. (66 Fed. Reg. 49079). Executive Order 13224 designated HAMAS as a "Specially Designated Global Terrorist," or SDGT, and blocked its assets under this designation as well. Executive Order 13224 also provides for other persons or organizations to be designated as SDGTs and thereby have their assets blocked, if found to *"act for or on behalf of"* HAMAS or to be *"owned or controlled by"* HAMAS.

44.     On December 4, 2001, the Secretary of the Treasury determined that the HLF *"acts for or on behalf of"* HAMAS, and designated the HLF as an SDT under Executive Order 12947 and as an SDGT under Executive Order 13224. Holy Land Foundation v. Ashcroft, 219 F. Supp.2d 57, 64 (D.D.C. 2002). Specifically, the Treasury based its determination on the fact that HLF functions as the fund-raising arm of HAMAS in the United States. Id. at 69-74. Pursuant to these designations, the Office of Foreign Assets Control ("OFAC") in the Treasury issued a "Blocking Notice" freezing all of HLF's funds, accounts and other property. Id. at 64. Exhibit A.

9

45. The District Court and Court of Appeals for the District of Columbia upheld the designation of the HLF as an SDT and SDGT on the basis of its role as the fund-raising arm of HAMAS in this country. Holy Land Foundation v. Ashcroft, 219 F. Supp.2d 57 (D.D.C. 2002), 333 F.3d 156 (D.C. Cir. 2003) cert. denied 124 S. Ct. 1506 (2004). Indeed, that Court of Appeals held that *"HLF's role in the funding of Hamas and of its terrorist activities is incontrovertible."* Id. at 165.

    d.  **The Effect of Blocking Under IEEPA**

46. Executive Orders 12947 and 13224 both prohibit "any transaction or dealing by United States persons or within the United States in property or interests in property" of SDTs and SDGTs without legal authorization from OFAC. Executive Order 12947 §1(b); Executive Order 13224 §2(a) (emphasis added).

47. Likewise, the OFAC regulations implementing the blocking orders provide that all property of SDTs and SDGTs are blocked and may not be "transferred, paid, exported, withdrawn or otherwise dealt in." 31 CFR §§594.201 and 595.201.

48. OFAC regulations define a "transfer" as including every imaginable disposition or modification of rights or interests in the property, and any type of encumbrance. 31 CFR §§594.312 and 595.313.

49. Moreover, the regulations also provide that any putative unlicensed "transfer" made in respect to blocked property "is null and void and shall not be the basis for the assertion or recognition of any interest in or right, remedy, power or privilege with respect to such property." 31 CFR §§594.202 and 595.202.

    e.  **The Terrorism Risk Insurance Act of 2002 Subjects the Blocked Assets of the HLF to Execution in Satisfaction of Plaintiffs' Judgment**

10

### Against HAMAS

50. On November 26, 2002, the President signed into law The Terrorism Risk Insurance Act of 2002 (Public Law 107-297; 116 Stat. 2322) ("TRIA").

51. Section 201 of Title II of the TRIA provides in relevant part that:

> Notwithstanding any other provision of law . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to, execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA §201(a).

52. The remedial legislative purpose of the TRIA was described in a recent decision of the U.S. District Court for the District of Columbia:

> The TRIA was . . . specifically intended "to deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism in any court of competent jurisdiction by enabling them to satisfy such judgments through the attachment of blocked assets of terrorist parties." 148 Cong. Rec. H8728 (Nov. 13, 2002).

Hill v. Republic of Iraq, 2003 WL 21057173 (D.D.C. 2003), at 2.

53. A "*terrorist party*" as defined by TRIA includes both terrorist organizations and designated foreign state sponsors of terrorism. TRIA §201(d)(4).

54. True to its remedial purpose, TRIA is revolutionary in two respects:

(i) Section 201 permits attachment and execution proceedings against terrorist parties "*Notwithstanding any other provision of law,*" and thereby expressly overrides any and all legal obstacles to enforcement. See e.g. Hill, 2003 WL 21057173 at 2 (holding that TRIA's

"notwithstanding" language overrides the IEEPA blocking regime, the Foreign Sovereign Immunities Act, and the Vienna Convention on Diplomatic Relations).

(ii) Section 201 also functions as an automatic statutory veil-piercing mechanism that allows American victims of terrorism holding a judgment against a "terrorist party" to also enforce that judgment against the assets of *"any agency or instrumentality of that terrorist party."* §201.

55. The machine-gun murder of the Ungars by HAMAS was an "act of terrorism" as defined by TRIA[2] and HAMAS clearly meets the definition of a "terrorist party" under TRIA.[3] Therefore, §201(a) renders all "blocked assets" of HAMAS, as well as all "blocked assets" of any agency or instrumentality of HAMAS subject to execution and attachment in aid of execution, in order to satisfy the Ungars' judgment against HAMAS. The assets of the HLF were blocked pursuant to Executive Orders 12947 and 13224 specifically because the HLF *"acts for or on behalf of"* HAMAS, and thus these assets are "blocked assets" of an agency and instrumentality of HAMAS subject to execution by plaintiffs under TRIA.[4]

---

[2] Section 201(d)(1) of TRIA provides that the term "act of terrorism" includes any terrorist activity as defined in section 212(a)(3)(B)(iii) of the Immigration and Nationality Act (8 U.S.C. §1182(a)(3)(B)(iii))). The latter provision defines terrorist activity as "any activity which is unlawful under the laws of the place where it is committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any State) and which involves any of the following . . . The use of any . . . explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain), with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property [or] A threat, attempt, or conspiracy to do any of the foregoing."

[3] Section 201(d)(4) of TRIA provides that the term "terrorist party" includes a "terrorist organization" as defined in section 212(a)(3)(B)(vi) of the Immigration and Nationality Act (8 U.S.C. §1182(a)(3)(B)(vi). The latter provision defines a terrorist organization as including "an organization . . . that is a group of two or more individuals, whether organized or not, which engages in" terrorist activity."

[4] Section 201(d)(2) of TRIA provides that the term "blocked asset" includes any asset blocked pursuant to IEEPA. As noted, the Executive Orders blocking HLF's assets were issued pursuant to IEEPA.

56. Accordingly, the District Court in Rhode Island expressly ruled, on the basis of the decisions of the District Court and Court of Appeals for the District of Columbia upholding the designation of the HLF as an SDT and SDGT and the findings therein, that the blocked assets of the HLF are subject to execution in satisfaction of the Ungars' judgment:

> On December 4, 2001, the Office of Foreign Asset Control, a division of the Treasury Department, determined that the HLF acts "for or on behalf of" Hamas and was thus a Specially Designated Terrorist under Executive Order 12947 and a Specially Designated Global Terrorist under Executive Order 13224. Holy Land Found. for Relief and Dev. v. Ashcroft, 219 F. Supp.2d 57, 64 (D.D.C. 2002). These designations allowed the Treasury Department to block all of the HLF's funds, accounts, and real property. Id.
>
> The Terrorism Risk Insurance Act of 2002, ("TRIA") subjects the blocked assets of a terrorist party, and any agency or instrumentality of that terrorist party, to execution or attachment in order to satisfy a judgment against them on any claim based on an act of terrorism. Pub. L. No. 107-297, 116 §201(a), Stat. 2322 (2002). The HLF is an agency and instrumentality of Hamas because it acts "for or on behalf of" Hamas as Hamas' fund-raising agent in the United States. <u>Therefore, the HLF's blocked assets are also subject to attachment and execution under the TRIA in order to satisfy the present judgment against Hamas</u>.

Ungar, 304 F. Supp.2d at 241 (emphasis added).[5]

57. Moreover, the United States District Court for the Northern District of Illinois has recently ruled that that HLF is collaterally estopped from contesting the findings made by the District Court and Court of Appeals for the District of Columbia upholding the designation of the HLF as an SDT and SDGT. Boim v. Quranic Literacy Institute, 340 F. Supp.2d 885 (N.D.Ill. 2004).

---

[5] This finding underlies the ruling by the Rhode Island district court that final judgment should enter against HAMAS pursuant to FRCP 54(b) despite the pendency of the action against other defendants. The court found that HLF's assets "are steadily depleting because the Treasury Department has allowed the HLF to use the assets to pay its attorneys to challenge the blocking order and defend the HLF against a civil action arising from its collection of funds for Hamas," and that this depletion of the limited pool of assets available to satisfy plaintiffs' judgment constituted sufficient grounds for immediate entry of final judgment under Rule 54(b). Id. at 241-242.

13

58. The HLF is therefore collaterally estopped from contesting the decisions and findings of the District Court and Court of Appeals for the District of Columbia that served as the basis of the determination of the Rhode Island district court that the HLF is an agency and instrumentality of HAMAS within the meaning of TRIA.

59. Additionally, HLF is collaterally estopped from contesting the Illinois district court's finding of estoppel.

60. Thus, the HLF is an agency and instrumentality of HAMAS within the meaning of §201 of TRIA and the blocked assets of the HLF are subject to execution in satisfaction of the Ungars' judgment pursuant to §201 of the TRIA.

f. **The Ungars' Enforcement Proceedings Under TRIA**

61. On February 24, 2004, the Ungars registered their judgment in the United States District Court for the District of Columbia, and on February 25, 2004, they served the Treasury with a subpoena seeking information regarding the location of all blocked assets of HAMAS and HAMAS' agencies and instrumentalities. In response to the Ungars' subpoena, the Treasury filed a motion stating that the information sought by the subpoena may be protected by the Trade Secrets Act, and declining to release the information without judicial authorization.

62. On May 7, 2004, the U.S. District Court for the District of Columbia issued a protective order authorizing release of the information sought by the Ungars, subject to numerous restrictions governing the use and confidentiality of the information.

63. On May 13, 2004, pursuant to the court order of May 7, the Treasury provided the Ungars with a list containing the details of all blocked assets of HAMAS and HAMAS' agencies

and instrumentalities held by financial institutions in the United States including the assets of the HLF.

64. The list provided by the Treasury indicated that blocked HLF funds totaling $5,045,037.80 are held by financial institutions in seven federal districts across the United States.

65. Acting pursuant to the list provided by the Treasury, the Ungars then registered their judgment in the Southern District of New York, the Southern and Northern Districts of California, the Western District of Washington, the Northern District of Texas, the District of New Jersey, and the Northern District of Illinois, and retained local counsel in each of those districts.

66. After the Ungars discovered that four of the HLF accounts identified by the Treasury as being in California were actually in South Carolina, they registered their judgment and retained local counsel in the District of South Carolina as well.

67. On August 10, 2004, the Ungars filed in this Court an application with supporting declaration for issuance of a writ of execution against Hamas and the HLF pursuant to TRIA.

68. On August 30, 2004, Judge Richard C. Casey of this Court entered an Order instructing the clerk of the court to issue a writ of execution in the form attached to his Order, and the clerk issued the writ in that form on September 1, 2004. Exhibit B.

The writ of execution issued by Judge Casey specifically provided that:

Pursuant to §201 of the Terrorism Risk Insurance Act of 2002, Public Law 107-297; 116 Stat. 2322, this Writ shall also be effective to execute upon the goods, chattels and other assets of The Holy Land Foundation for Relief and Development a/k/a The Holy Land Foundation ("HLF") in satisfaction of Plaintiffs' judgment against the Defendant, and the phrase *"goods, chattels and other assets of HAMAS - Islamic Resistance Movement a/k/a Harakat Al-Muqawama Al-Islamiyya"* appearing herein shall therefore also include goods, chattels and other assets of the HLF.