69. Substantively identical writs of execution (with minor stylistic variations reflecting local practice) were issued by the United States District Court for the Western District of Washington (on September 2, 2004) and by the United States District Court for the District of South Carolina (on September 8, 2004).

70. The Ungars <u>did not</u> require an OFAC license for their execution proceedings because §201 of TRIA, which permits execution against blocked assets "*Notwithstanding any other provision of law,*" overrides the IEEPA blocking regime.

71. Accordingly, "***No license by the Office of Foreign Assets Control of the U.S. Treasury Department is required as a precondition***" to an execution under TRIA. <u>Daliberti v. J.P Morgan Chase & Co.</u>, 2003 WL 340734 at 2 (S.D.N.Y. 2003). Indeed, the federal courts have without exception authorized executions under TRIA without any OFAC license. See e.g. <u>Hill v. Republic of Iraq</u>, 2003 U.S. Dist. LEXIS 3725 (D.D.C. March 11, 2003); <u>Weinstein v. Islamic Republic of Iran</u>, 274 F. Supp.2d 53 (D.D.C. 2003).

72. Most recently, in an execution proceeding brought under §201 of TRIA in the U.S. District Court for the Northern District of Texas (Amarillo) against a property in Lubbock owned by Iran and blocked under IEEPA, the Justice Department notified the court that, "under the current legal framework, the United States is not in a position to interpose any objection to the seizure and sale of the property . . . " Notice of the United States, filed in <u>Rubin v. Islamic Republic of Iran</u>, (Civil No. 2-03MC-0014J N.D. Texas). Exhibit C.

73. Accordingly, the Amarillo federal district court ordered the sale of the property, and on January 4, 2005, the property was sold by the U.S. Marshal and the proceeds transferred

16

to the Rubin plaintiffs—all with no OFAC license. See Docket nos. 12-15, in Rubin, *supra*, Civil No. 2-03MC-0014J.

### g. The Government's Criminal and Forfeiture Proceedings Against HLF

74. Following the HLF's designation as a terrorist group and the blocking of its assets, the government pursued a criminal investigation of HLF.

75. In early April, 2002, the U.S. District Court for the Northern District of Texas (Dallas) issued four search warrants permitting federal agents to examine documents and moveable property of the HLF seized by OFAC from HLF's offices and held in storage facilities in Dallas, San Diego, Newark and Mundelein, Illinois. See Docket nos. 1-5 in USA v. 11025 Switzer Ave, et al., 3:02-MJ-119; Docket no. 94 in USA v. Holy Land Foundation, 04-cr-00240.

76. However, because the HLF's property is blocked under IEEPA, the warrants issued by the Dallas federal court were ineffective to permit the FBI to conduct the searches. The Justice Department was therefore required to seek a license from OFAC, permitting execution of the search warrants issued by the federal court. Accordingly, on April 9, 2002, OFAC issued a "Directive License" (No. SDGT-53) permitting the FBI (which OFAC defines therein as a "licensee") to access, examine, copy and remove HLF's property "in furtherance of a criminal search warrant." Exhibit D.

77. On July 26, 2004, the United States filed a forty-two count indictment against the HLF and its principals in the Dallas federal district court ("indictment"). USA v. Holy Land Foundation, 04-cr-00240.

78. The indictment includes a demand for forfeiture of $12,400,000 in tainted assets, as well as a demand for forfeiture of substitute assets.

79. However, the filing of the indictment and forfeiture demand could not purport to, and did not, have any legal effect on the blocked HLF funds, because (as noted) the executive blocking orders and regulations prohibit and nullify *ab initio* any and all unlicensed dispositions in blocked property. 31 CFR §§594.202 and 595.202.[6]

80. Accordingly, on September 23, 2004, OFAC issued a License (No. SDGT-382) authorizing the Department of Justice "to pursue criminal forfeiture of the assets of the Holy Land Foundation for Relief and Development ("HLF") blocked pursuant to" Executive Orders 12947 and 13224 ("Forfeiture License"). Exhibit E.

81. Thus, the first date on which the forfeiture demand contained in the indictment could possibly have become legally effective in respect to the blocked HLF assets was September 23, 2004, when OFAC authorized the forfeiture proceedings.

82. The Forfeiture License further provided that, "This authorization includes the pursuit of restraining orders necessary to preserve the status of the Blocked Assets prior to their forfeiture or other final disposition." Id.

83. And indeed, the next day, September 24, 2004, the United States Attorney filed in USA v. Holy Land Foundation, a pleading styled as "Government's *Ex Parte* Application For Post-Indictment restraining order," (hereinafter "*Ex Parte* Application"), accompanied by a proposed order. Exhibit F.

84. The *Ex Parte* Application sought a restraining order, pursuant to 21 U.S.C. §853(e)(1)(A), "to preserve the availability of certain property that is subject to forfeiture" in the criminal action and identifies the "certain property" whose restraint is sought as blocked HLF

---

[6] In any event, the indictment does not allege that the blocked HLF funds in the United States are tainted assets.

funds held by "various financial institutions" listed in a document labeled "Attachment A" and appended to the *Ex Parte* Application. Id. at pages 1-2.

85. Significantly, the *Ex Parte* Application dedicates a full page to the Ungars' enforcement proceedings under TRIA, and specifically argues that a restraining order is necessary to prevent the Ungars from reaching the blocked HLF funds. Id. at p. 3.

86. Indeed, the Ungars' enforcement proceedings are cited by the government as the first and main ground for granting its Application, and halting the Ungars' proceedings is presented as the very raison d'être of the requested restraining order.

87. That day, September 24, 2004, the Dallas federal court granted the *Ex Parte* Application and issued a Post-Indictment restraining order in the form proposed and submitted by the U.S. attorney. Exhibit G.

    h.    **The Respondent Banks' Response to the restraining order**

88. In light of the restraining order, which purports to remain in force indefinitely, the respondent banks have refused to comply with the writ of execution issued by this Court.

    i.    **The Ungars' Appeal**

89. The restraining order is void and/or of no effect for several reasons, set forth fully below.

90. The Ungars had, and continue to have, the option of contesting the restraining order either in this Court (and in the other district courts in which they have initiated execution proceedings against HLF), or in the Court of Appeals for the Fifth Circuit, or in all the fora in parallel.

91.  Indeed, as discussed below, in virtually identical circumstances the Fifth Circuit itself affirmed a decision by the district court for the Canal Zone granting a creditor's request to disregard a restraining order issued by a federal district court in Illinois that purported to halt execution proceedings pending in the Canal Zone court. Wong Shing v. M/V Mardina Trader, 564 F.2d 1183, 1188 (5th Cir. 1978). The Ungars were (and are) entitled to ask this Court to take the same course.

92.  Nevertheless, in order to prevent a multiplicity of proceedings and to preserve their limited resources, and out of respect for the Dallas federal court and the Court of Appeals for the Fifth Circuit, the Ungars decided to appeal the restraining order in that circuit. The Ungars' appeal remains pending in the Fifth Circuit.

93.  However, the Ungars' attempt to litigate the validity of the restraining order in the Fifth Circuit may prove to be in vain, due the position of the government itself: in a brief recently submitted by the Justice Department in response to a motion for summary disposition of the appeal filed by the Ungars, the government has now asserted that the Ungars have no standing to contest the restraining order in the Dallas district court or the Fifth Circuit. The government's response brief indicates that it intends to expand on this standing argument in its appellate brief.

94.  Thus, if the government's argument that the Ungars' have no standing to contest the restraining order in either the Fifth Circuit or the Dallas district court is accepted by the Fifth Circuit, the Ungars will have no recourse but to challenge the validity and force of the restraining order in this Court and the other district courts in which petitioners have commenced execution proceedings.

95. Effectively, the Justice Department is insisting (for reasons known only to it) on litigating the force and effect of the restraining order in several different district courts across the country.

96. Therefore, out of an abundance of caution and to preserve their rights in the event that the government's standing argument prevails in the Fifth Circuit and/or that the Fifth Circuit declines to reach some or all of petitioners' arguments, petitioners have been compelled to file the instant action.

### THE RESTRAINING ORDER IS VOID AND/OR INEFFECTIVE TO PREVENT PETITIONERS' ENFORCEMENT PROCEEDINGS UNDER §201 OF TRIA

97. The restraining order is void and/or ineffective to prevent petitioners' enforcement proceedings for at least three[7] reasons:

   a. **The Blocked HLF Funds Were in the Custody of This Court (*in custodia legis*) at the Time That the restraining order was Issued and the Dallas District Court Therefore Lacked Jurisdiction to Issue the restraining order**

98. It is long settled that:

> [W]here a court of competent jurisdiction has, through its officers, taken property into its possession, the property is thereby withdrawn from the jurisdiction of other courts. Having possession, the court may not only issue all writs necessary to protect its possession from physical interference, but is entitled to determine all questions respecting the same.

Ex parte Baldwin, 54 S.Ct. 551, 553 (1934).

99. The Fifth Circuit itself has repeatedly reiterated this rule. See e.g. Wong Shing v. M/V Mardina Trader, 564 F.2d 1183, 1188 (5th Cir. 1978) ("When a court of competent

---

[7] In their pending appeal to the Fifth Circuit petitioners also assert that the blocked HLF assets cannot be restrained pursuant to 21 U.S.C. §853(e)(1)(A) because they are not alleged in the indictment filed against HLF to be "tainted" assets.

jurisdiction takes possession of property through its officers, that property is withdrawn from the jurisdiction of all other courts."); In re Rehkopf Mattress Sales, Inc., 479 F.2d 67, 70 (5th Cir. 1973) (noting the "general rule that when a court of competent jurisdiction takes possession of property through its officers, that property is withdrawn from the jurisdiction of all other courts which, though of concurrent jurisdiction, may not disturb that possession.").

100. This rule is commonly known as the *in custodia legis* doctrine. See e.g. Ciel y Cia S.A. v. Nereide Societa di Navigazione per Azioni, 28 B.R. 378, 381 (E.D.Va. 1983) (holding that after property "has been seized by the Marshal under *in rem* process" in one court, the *in custodia legis* doctrine trumps even bankruptcy proceedings, and exclusive jurisdiction over the property lies with the first court rather than the bankruptcy court).

101. The *in custodia legis* doctrine controls the instant case because on September 24, 2004, when the restraining order was issued, the blocked HLF funds held by the respondent banks were already in the custody of this Court.

102. On September 1 and 2, 2004, the U.S. Marshal for the Southern District of New York levied the writ of execution issued by this court on the respondent banks. Exhibit H.

103. Under New York law, the levying of a writ of execution places the subject assets within the legal custody of the court. See e.g. Ruvolo v. Long Island R. Co., 45 Misc.2d 136, 144, 256 N.Y.S.2d 279, 287 (1965) ("Actual possession by the Sheriff or removal from the premises of the debtor was in no way required. 'Once levied upon the property is deemed to be *in custodia legis*.')(quoting Matter of Livingston, 30 Misc.2d 71, 74, 211 N.Y.S.2d 897, 900, affd. on other grounds 14 AD2d 264, 220 N.Y.S. 434 (1961)); Sheridan Farms, Inc. v. Federico, 48 Misc.2d 599, 265 N.Y.S.2d 922 (App.Term 1st Dep't, 1965) ("The property was inventoried by

the marshal and the debtor put on notice that it was being levied upon pursuant to the execution lodged with the marshal, who left with the debtor copies of the execution, inventory and notice of sale and posted a notice of levy. The marshal thereby exercised dominion and took custody of the property pursuant to the levy and it passed from the debtor's custody and was placed in custodia legis.").

104. Rule 69(a) of the Federal Rules of Civil Procedure provides that execution proceedings in a federal court are governed by state law, and the question of whether property is *in custodia legis* of a federal court is therefore controlled by the law of the state in which it sits. See e.g. U.S. v. Powell, 639 F.2d 224, 225 (5th Cir. 1981) (holding that execution against funds held in registry of a Texas federal court is governed by Fed.R.Civ.P. 69(a) which in turn requires the application of Texas law including *custodia legis* doctrine as recognized in Texas law).

105. Thus, in early September 2004, the blocked HLF assets held by the respondent banks were in the custody of this Court, and those funds were thereby "*withdrawn from the jurisdiction of all other courts*." Wong Shing, 564 F.2d at 1188.

106. The District Court for the Northern District of Texas therefore lacked jurisdiction to issue an order restraining those funds on September 24, 2004.[8]

107. Indeed, the facts of Wong Shing are substantively identical to those presented in the instant case:

108. The United States Marshal had seized a vessel pursuant to enforcement proceedings brought in the U.S. district court for the Canal Zone. A third-party (a trustee acting for other creditors of the ship owners) then successfully moved a federal court in Illinois to issue

---

[8] Also, as noted, the earliest possible date on which the forfeiture demand contained in the indictment became legally effective was September 23, 2004, when OFAC issued the Forfeiture License.

23

a restraining order prohibiting the sale of the vessel. The district court in the Canal Zone court ordered the United States Marshal to disregard the Illinois restraining order and to proceed with the sale.

109. The Fifth Circuit affirmed the decision of the district court in the Canal Zone to ignore the restraining order, and expressly held that the Illinois federal court was <u>without jurisdiction</u> to issue the restraining order since, "When a court of competent jurisdiction takes possession of property through its officers, that property is withdrawn from the jurisdiction of all other courts." Id. at 1188.

110. Exactly so here: once this Court took possession of the blocked HLF funds within its jurisdiction, the district court for the Northern District of Texas was without jurisdiction to issue a restraining order in respect to those funds. This Court alone is *"entitled to determine all questions respecting"* those assets. Baldwin, 54 S.Ct. at 553.

111. The restraining order is therefore void *pro tanto* for lack of jurisdiction, to the extent that it purports to restrain the blocked HLF funds held by the respondent banks.

    b.    **<u>Section 201 of TRIA Permits Execution Against the Blocked HLF Funds Notwithstanding the Government's Forfeiture Proceedings, and the restraining order is Therefore Void and/or Ineffective to the Extent it Purports to Prevent Enforcement Proceedings Pursuant to TRIA</u>**

112. All blocked HLF assets are subject to execution by the Ungars under §201 of TRIA, even assuming *arguendo* that they were not already within the custody of this Court.

113. As noted, §201 of TRIA permits attachments and executions "Notwithstanding any other provision of law," and its clear remedial purpose is to assist American victims of terrorism to enforce judgments against terrorist parties: