> The TRIA was . . . specifically intended "to deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism in any court of competent jurisdiction by enabling them to satisfy such judgments through the attachment of blocked assets of terrorist parties." 148 Cong. Rec. H8728 (Nov. 13, 2002).

Hill, 2003 WL 21057173 at 2.

114.   The case law applying and interpreting §201 of TRIA clearly establishes that the "notwithstanding" provision of §201 operates to <u>override all statutory limitations</u> on attachment and execution:

> This matter concerns the efforts of plaintiffs, 180 individuals in whose favor default judgments have been entered against the Republic of Iraq ("Iraq"), to satisfy those judgments [against] accounts . . . that are held by garnishee Riggs Bank NA in the name of the Embassy of Iraq Commercial Office (the "Iraqi Accounts"). <u>Both of these accounts have been blocked since August 2, 1992 pursuant to Executive Order No. 12722 and the International Emergency Economic Powers Act. 50 U.S.C. §§1701-02.</u> Plaintiffs have moved this Court for issuance of an order directing execution against those accounts. The Court finds that each of these accounts is subject to execution under the Terrorism Risk Insurance Act ("TRIA") . . .
>
> Section 201 of the TRIA states that "[n]otwithstanding any other provision of law," the blocked assets of a terrorist party "shall be subject to execution or attachment in aid of execution." <u>As this Court has frequently recognized, "the phrase 'notwithstanding any other provision of law,' or a variation thereof, means exactly that; it is unambiguous and effectively supersedes all previous laws."</u> *Energy Transp. Group, Inc v. Skinner*, 752 F.Supp. 1, 10 (D.D.C. 1990); *see also Crowley Caribbean Transp., Inc. v. United States*, 865 F.2d 1281, 1283 (D.C.Cir. 1989) ("[a] clearer statement [than 'notwithstanding any other provision of law'] is difficult to imagine"). <u>Accordingly, by its plain terms, the TRIA overrides any immunity from execution that blocked Iraqi property might otherwise enjoy under the Vienna Convention [on Diplomatic Relations] or the FSIA.</u>

Hill, 2003 WL 21057173 1-2 (emphasis added).

115.   Similarly, in <u>Hegna v. Islamic Republic of Iran</u>, 376 F.3d 485 (5th Cir. 2004), the Fifth Circuit affirmed that (subject to a narrow exception)[9] TRIA overrides the immunity

---

[9] I.e., that the property is being used exclusively for diplomatic or consular purposes. Hegna, 376 F.3d at 494.

25

provisions of the Vienna Convention and permits execution against diplomatic property subject to the Convention.

116.   Thus, TRIA's "notwithstanding" language overrides (1) executive blocking orders issued pursuant to IEEPA (2) the FSIA and (3) the Vienna Conventions. This fact is extremely significant, because the federal courts have consistently held that IEEPA, the FSIA, and the Vienna Convention are themselves all legal regimes of superior and overriding normative force:

117.   In Charles T. Main Intern., Inc. v. Khuzestan Water & Power Authority, 651 F.2d 800 (1st Circuit 1981), the First Circuit held that, *"The language of IEEPA is sweeping and unqualified*," and that the IEEPA blocking regime empowers the President to override judicial remedies, such as attachments and injunctions, and to extinguish "interests" in foreign assets held by United States citizens. Id. at 807.

118.   In Dames & Moore v. Regan, 101 S.Ct. 2972, 2983 (1981), the Supreme Court explained the legislative purpose behind the IEEPA blocking regime:

> This Court has previously recognized that the congressional purpose in authorizing blocking orders is "to put control of foreign assets in the hands of the President . . ." *Propper v. Clark*, 337 U.S. 472, 493, 69 S.Ct. 1333, 1345, 93 L.Ed. 1480 (1949). Such orders permit the President to maintain the foreign assets at his disposal for use in negotiating the resolution of a declared national emergency.

119.   Quoting with approval the holding in Charles T. Main that IEEPA's provisions are "sweeping and unqualified" (Id. at 2982), the Supreme Court upheld the validity of orders issued by the President under IEEPA which extinguished third-party rights in Iranian property:

> Because the President's action in nullifying the attachments and ordering the transfer of the assets was taken pursuant to specific congressional authorization, it is supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who

26

might attack it.

Dames, 101 S.Ct. at 2984 (internal quotes omitted).

120. The overwhelming normative force of IEEPA and blocking orders issued pursuant thereto has been recognized by a long series of cases, including a recent decision of the Fifth Circuit:

> The <u>IEEPA grants the President sweeping powers</u> to prohibit "any person['s]" participation in any transaction involving or the exercise of any right, power, or privilege with respect to any "property in which any foreign country . . . has any interest." See 50 U.S.C. §1702(a)(1)(B). Pursuant to this broad authority, President Reagan authorized a freeze on all property and interests in property of the GOL and its agencies, controlled entities and instrumentalities that are in the United States or hereafter come into the possession or control of U.S. persons . . . <u>In matters like this, which involve foreign policy and national security, we are particularly obliged to defer to the discretion of executive agencies interpreting their governing law and regulations.</u>

Paradissiotis v. Rubin, 171 F.3d 983, 988 (5th Cir. 1999).

121. Thus, §201 of TRIA is truly revolutionary. Until the enactment of TRIA, the normative force of IEEPA reigned supreme over all other legal norms, and permitted the President to utilize his "sweeping powers" to exercise total dominion over foreign assets and override the rights of all third-parties vis-à-vis such assets. Indeed, as noted, even the FBI and the U.S. Attorney are unable to execute a search warrant issued by a federal court against blocked assets, or to seek judicial forfeiture or restraint of such assets, without first obtaining licenses from OFAC.

122. No longer: since the enactment of §201, the Ungars and other victims of terrorism are entitled to override IEEPA blocking orders, and to attach and execute freely against assets blocked pursuant to IEEPA, without any OFAC license.

123. Since TRIA's "Notwithstanding any other provision of law" proviso overrides even the "sweeping" national security provisions of IEEPA which are "supported by the strongest of presumptions and the widest latitude of judicial interpretation" (Dames at 2984) that "notwithstanding" proviso must *a fortiori* trump any and every garden-variety "provision of law" governing forfeitures.[10]

124. This interpretation is not only mandated by the peremptory "notwithstanding" language of §201, it is also demanded by TRIA's legislative purpose. Congress did not arm victims of terrorism such as the Ungars with a statute that overrides even the overwhelming – and heretofore insuperable – national security powers of the President under IEEPA, only to leave them vulnerable to common forfeiture proceedings. Indeed, in virtually every imaginable case, the blocked U.S.-based assets of terrorist organizations subject to execution under §201 would also be potentially subject to some type of forfeiture. Thus, an interpretation that reads into TRIA's "notwithstanding" language an unwritten exception for forfeiture provisions would effectively permit the government to thwart virtually all TRIA enforcements by the simple expedient of initiating forfeiture proceedings.

125. Such a result would utterly contradict and defeat Congress' express intent in enacting TRIA.

126. This analysis is also strongly supported by the fact that TRIA overrides the FSIA and the Vienna Conventions:

---

[10] Or, stated somewhat differently, as a transitive principle of logic: since TRIA is normatively superior to IEEPA (no OFAC license required for execution), and IEEPA is normatively superior to the provisions governing forfeitures (OFAC license required for forfeiture) then TRIA is *per force* normatively superior to the forfeiture provisions and permits attachment and execution "notwithstanding" those forfeiture provisions.

127. The FSIA "sets forth the sole and exclusive standards to be used in resolving questions of sovereign immunity raised by foreign states before Federal and State courts in the United States." H.R.Rep. No. 94-1487, 94th Cong., 2d Sess. (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6610.

128. Moreover, exceptions to immunity are construed narrowly. See e.g. Sampson v. Federal Republic of Germany, 250 F.3d 1145, 1156 (7th Cir. 2001); Mendenhall v. Saudi Aramco, 991 F.Supp. 856, 858 (S.D.Tex. 1998) (citing cases).

129. Section 1609 of the FSIA provides: "Subject to existing international agreements to which the United States is a party at the time of enactment of this Act the property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter." 28 U.S.C. §1609.

130. Yet, as noted, "the TRIA overrides any immunity from execution that blocked Iraqi property might otherwise enjoy under. . . the FSIA." Hill at 2.

131. Thus, the "notwithstanding" language of §201 overrides even the provisions of §§1610-11 of the FSIA which were – until the enactment of TRIA – "the sole and exclusive standards" governing the immunity of the property of foreign states.

Likewise:

> There is . . . a firm and obviously sound canon of construction against finding implicit repeal of a treaty in ambiguous congressional action. A treaty will not be deemed to have been abrogated or modified by a later statute unless such purpose on the part of Congress has been clearly expressed.

Trans World Airlines v. Franklin Mint Corp., 104 S.Ct. 1776, 1782 (1984) (internal quotation marks omitted).

132. Therefore, only a "clearly expressed" enactment by Congress can overcome the immunity granted to diplomatic property under the Vienna Conventions.

133. As noted, the Fifth Circuit (in Hegna) and the Hill court both found that §201 of TRIA overrides the Vienna Conventions.

134. Thus, here too: since TRIA's "notwithstanding" language is effective to override the presumptions against any derogation from the broadly construed norms contained in the FSIA and the Vienna Conventions, it is per force effective to defeat any run-of-the-mill provisions of law governing forfeitures.

135. Therefore, §201 of TRIA overrides any provision of law governing or permitting forfeitures, and any forfeiture proceedings brought pursuant thereto are ineffective to defeat or interfere with the Ungars' right to attach and execute under TRIA. Thus, the restraining order is void and/or of no effect to the extent that it purports to prevent the Ungars' TRIA proceedings.

    c.    <u>The restraining order Was Given in Violation of Rule 65 of the Federal Rules of Civil Procedure and the Fifth Amendment and In Any Case Has Expired by Operation of Rule 65</u>

136. The Dallas district court entered the restraining order on the basis of 21 U.S.C. §853(e)(1)(A).

137. As the Fifth Circuit reiterated just recently:

> [T]he requirements of Federal Rule of Civil Procedure 65, including Rule 65's hearing requirements and time limits on ex parte restraining orders, apply to ex parte restraining orders and injunctions issued under 21 U.S.C. §853(e)(1)(A). *See United States v. Thier*, 801 F.2d 1463, 1468-69 (5th Cir. 1986), *modified*, 809 F.2d 249 (5th Cir. 1987); *accord United States v. Crozier*, 777 F.2d 1376, 1384 (9th Cir. 1985).

<u>U.S. v. Melrose East Subdivision</u>, 357 F.3d 493, 500 (5th Cir. 2004).

138. In U.S. v. Thier, 801 F.2d 1463, 1468-69 (5th Cir. 1986) the Fifth Circuit explained that the "irreparable loss" and "notice" requirements of Rule 65 are satisfied, in respect to a criminal defendant, by the exigencies of a criminal proceeding and the filing of an indictment.

139. As discussed, however, the restraining order in this case was aimed entirely at the Ungars, not at the criminal defendant – i.e. the HLF. (Indeed, the HLF itself cannot deplete the assets because they are blocked). Therefore, there was no legal basis under Rule 65 to enter an *ex parte* restraining order. The Ungars should have been provided prior notice and a hearing as required by Rule 65, and the failure to do so renders the restraining order void.

140. Moreover, the failure to provide notice and a hearing before purporting to extinguish the Ungars' execution proceedings violated their Fifth Amendment due process rights, and for this reason, too, the restraining order is void. See e.g. U.S. v. Melrose East Subdivision, 357 F.3d at 499 ("authorities interpreting . . . 21 U.S.C. §853(e), are in broad agreement that due process requires the district court to hold a prompt hearing at which the property owner can contest the restraining order")(citing cases); United States v. Roth, 912 F.2d 1131, 1132 (9th Cir. 1990); United States v. Crozier, 777 F.2d 1376 (9th Cir. 1985).

141. In any case, under Rule 65 an ex parte restraining order expires automatically after ten days. See e.g. Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 of Alameda County, 94 S.Ct. 1113, 1124 (1974) (restraining order expired automatically under Rule 65 after ten days); U.S. v. Thier, 801 F.2d 1463, 1468-69 (5th Cir. 1986) ("an *ex parte* restraining order is effective for a maximum of ten days").

142. Thus, even assuming *arguendo* that it was ever valid, the restraining order expired ten days after it was given on September 24, 2004, and is now of no force or effect.

143. Therefore, the respondent banks have no grounds to regard the restraining order as legally valid or effective and must comply with the writ of execution issued by this Court.

## COUNT I
## BY ALL PETITIONERS AGAINST ALL RESPONDENTS
## TURNOVER

144. The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

145. Respondent HLF is an agency and instrumentality of HAMAS within the meaning of TRIA §201 and its blocked assets are subject to attachment and execution in satisfaction of petitioners' judgment pursuant to §201 of TRIA.

146. The respondent banks hold blocked assets of the HLF.

147. The respondent banks were served with a writ of execution issued by this Court directing them to transfer to the United States Marshal for turnover to petitioners all HLF assets in their possession.

148. The respondent banks have refused to comply with the writ of execution in light of the restraining order issued by the United States District Court for the Northern District of Texas on September 24, 2004.

149. The restraining order is void and ineffective to prevent petitioners' execution proceedings against the blocked HLF assets and does not legally restrain the respondent banks from complying with the writ of execution issued by this Court.

150. There is no legal or other obstacle preventing the respondent banks from complying with the writ of execution issued by this Court.

151. Petitioners are therefore entitled to judgment determining that the blocked assets of HLF are subject to execution and attachment in aid of execution in satisfaction of their judgment and ordering the respondent banks to transfer to the United States Marshal for turnover to petitioners all HLF assets in their possession.

WHEREFORE, petitioners respectfully demand judgment against respondents

(i) Determining that the blocked assets of HLF are subject to execution and attachment in aid of execution in satisfaction of petitioners' judgment and ordering the respondent banks to transfer to the United States Marshal for turnover to petitioners all HLF assets in their possession; and

(ii) Awarding petitioners their costs, expenses, disbursements and attorney's fees in connection with this proceeding, together with such other and further relief that this Court deems just, proper and equitable.

Plaintiffs,
By their attorneys,

_____
Lee Squitieri
32 East 57th Street, 12th Floor
New York, NY 10022
(212) 421-6492
(212) 421-6553  fax

David J. Strachman
McIntyre, Tate, Lynch & Holt
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095  fax

Dated: New York, New York,
April 11, 2005